# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____
                                            )
J. Jesus Rios,                              )
                                            )
                  Petitioner,               )
                                            )
         v.                                 )          No.
                                            )
U.S. DEPARTMENT OF HOMELAND                 )
SECURITY, CUSTOMS AND BORDER                )
PROTECTION,                                 )
                                            )
                  Respondent.               )
_____     )

## <u>PETITION FOR REVIEW</u>

Petitioner J. Jesus Rios hereby petitions the court for review of

the decision of Mark J. Keppler, Arbitrator, issued on September 5,

2023 (attached).

                              Respectfully Submitted,

/s/ Julie M. Wilson          National Treasury Employees Union
Julie M. Wilson              800 K Street, N.W., Suite 1000
General Counsel              Washington, D.C. 20001
                             (202) 572-5500
/s/ Paras N. Shah            Counsel for Petitioner
Paras N. Shah
Deputy General Counsel

/s/ Allison C. Giles
Allison C. Giles
Assistant Counsel            October 25, 2023

ARBITRATION DECISION

U.S. CUSTOMS AND BORDER PATROL

AND

NATIONAL TREASURY EMPLOYEES UNION, CHAPTER 145

|  |
|---|
| In the Matter of:<br><br><div align="right">J. Jesus Rios<br>(Grievant)</div> |

Date of Alleged Infraction:  July 18, 2022

Hearing Dates: January 12-13, February 28,  March 1 and 28, 2023

Decision Date: September 5, 2023

## I.    **Appearances**

### A.  **For U.S. Customs & Border Patrol ("CBP," "Agency" or "Employer")**
1.  Felix Martinez, Attorney for the Agency
2.  Daniel Salmon, Special Agent for U.S. Dept. of Homeland Security, Office of Professional Responsibility
3.  Edwin Marvin Donnelly, III – Senior Special Agent with U.S. CBP Office of Professional Responsibility ("OPR")
4.  Rita Nadine Hubbard – Program Manager CBP Office of Human Resources Management
5.  Diego Hernandez – Chief CBP Officer
6.  Mirtha Cifuentes – Agency Labor and Employee Relations Specialist

### B.  **For the NTEU, Chapter 145 ("Union")**
1.  Elizabeth Keyes, Attorney for the Union
2.  Jorge Campos – Union Vice President and Chief Steward
3.  J. Jesus Rios, Grievant ("Grievant")

## II.    **Exhibits[1]**

### A.  **Joint Exhibits**

1.  October 1, 2017 USCBP and NTEU National Master Labor Agreement ("CBA")
2.  USCBP Standards of Conduct, CBP Directive 51735-013A  (March 13, 2012)
3.  USCBP Standards of Conduct, CBP Directive 51735-013B  (December 9, 2020)

---

[1]    Exhibits will be noted from the source (i.e., Joint Exhibit = "JE," Agency Exhibit = "AE," and Union Exhibit = "UE"), followed by colon and the page number (e.g., "JE:x").

4. CBP Tables of Offenses and Penalties (December 9, 2020)
5. Proposal Letter and Acknowledgement; (April 20, 2022 and April 22, 2022)
6. CBP OPR Report of Investigation ("ROI") Case No. 201910990 - J. Jesus Rios (Feb. 9, 2022)
7. Electronic Questionnaires for Investigations Processing ("e-QIP") #28399213 - J. Jesus Rios (July 12, 2019)
8. Union's Reply to Proposal Letter (June 15, 2022)
9. Decision Letter and Acknowledgement (April 28, 2022)
10. Invocation - NTEU Chp. 145, J. Jesus Rios Removal
11. CBP OPR ROI – Video Recorded Interview (Dec. 6, 2021)
12. Oral Reply – Video recording (0:48:03) - J. Jesus Rios Represented by NTEU 145 VP Jorge Campos (June 15, 2022)

**B. Agency Exhibits**

1. Position Description: CBP Officer, GS-12, 1895-12 (Aug. 6. 2010)
2. [Blank]
3. Dept. of Homeland Security, Memorandum - Policy Statement, Subject: Department Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Dept. of Homeland Security Witnesses *("Giglio* Policy")
4. Agency Exhibit 4: Dept. of Homeland Security, Office for Civil Rights and Civil Liberties, Memorandum - DRS Immigration Terminology Changes (Nov. 23, 2021)
5. Dept. of Homeland Security, Memorandum - Updated Terminology for CBP Communications and Materials (April 19, 2021)

**C. Union Exhibits**

1. Letter from Jorge Campos (Union VP) to Mirtha Cifuentes (Agency Labor & Employee Relations Specialist), Re: Information Request for CBPO J. Jesus Rios: Proposed Removal (May 2, 2022)
2. Letter from Elizabeth Reyes (Union Attorney) to Felix Martinez Velez (Agency Attorney), Re: J. Jesus Rios Removal (Dec. 23, 2022)
3. Email from Enrique Garcia to Selected Agency Personnel, Re: Updated Terminology for CBP Communication Materials (April 19, 2021)
4. Letter from Elizabeth Reyes (Union Attorney) to Felix Martinez Velez (Agency Attorney), Re: J. Jesus Rios Arbitration Hearing (Jan. 3, 2023)
5. Grievant's Annual Leave (Jan. 3, 2020 to July 1, 2022)

## III.   Issue

The parties stipulated to the following issue: Was the removal of CBPO J Jesus Rios for the offense of lack of candor for such cause as will promote the efficiency of the Service? If not, what is the appropriate remedy? Tr. 1:4[2]

---

[2]   Transcripts will be note by volume, followed by page number (e.g., Tr. "X:y")

## IV.    Relevant CBA Provisions and Policies

### A. CBA

### Article 1:  Coverage

The terms of this Agreement apply to all professional and non-professional employees of U.S. Customs and Border Protection (CBP), excluding:

Employees in the Office of Border Patrol who are assigned to Border Patrol Sectors; Employees of the Office of Chief Counsel; and Management officials, supervisors, and other employees excluded from the bargaining unit in accordance with 5 U.S.C. § 7112(b)(2), (3), (4), (6) and (7).

In the event the National Treasury Employees Union is certified as the exclusive representative of any additional bargaining unit(s) within CBP after the effective date of this Agreement, the parties may, by mutual agreement, automatically cover such unit(s) by the terms of this Agreement.

### Article 2:  Fairness and Equitability

Section 1. Several provisions in this Agreement require that the Employer exercise its authority or discretion in a fair and impartial (or fair and equitable) manner. Unless otherwise defined, such terms will be interpreted to mean that the Employer will exercise the referenced authorities or discretion fairly and consistently so as to avoid adverse impact. To clarify, this provision does not require the authority or discretion itself to be fair and impartial (or fair and equitable) on its face; but rather that it be applied, or followed fairly and impartially (fairly and equitably). In other words, the provision simply requires that the referenced authorities or discretion be applied (or not applied) in accordance with law, rule, regulation, and this Agreement to similarly situated bargaining unit employees, without bias, favoritism, arbitrariness or consideration of reasons not relating to merit or mission.

### Article 3: Effect of Law & Regulations

Section 1. Except as provided by law, in the administration of all matters covered by this Agreement, the parties are governed by:

- Existing or future laws;
- Government-wide rules or regulations in effect on the date the Agreement becomes effective;
- Government-wide rules and regulations issued after the Agreement is effective which do not conflict with the contract and over which all bargaining responsibilities have been fulfilled; and
- Department of Homeland Security and U.S. Customs and Border Protection rules and regulations which do not conflict with this Agreement and over which all bargaining responsibilities have been fulfilled.

***

### Article 6:  Agency Rights

Section 1. In accordance with the Civil Service Reform Act of 1978 the Agency retains the authority:

\*\*

B. In accordance with applicable laws:

(1) To hire, assign, direct, lay off, and retain employees in the Agency, or to suspend, remove, reduce in grade or pay, or to subject such employees to other remedial action

\*\*\*

### Article 7:  Protection Against Prohibited Personnel Practices

Section 1.A. For the purpose of this Article and in accordance with 5 U.S.C. § 2302, "prohibited personnel practice" means any action described in Section 2.

B. For the purpose of this Article, "personnel action" means a(n):

\*\*\*

(3) Adverse action, disciplinary action or other corrective action

\*\*\*

Section 5.A. In accordance with 5 U.S.C. § 7121, an employee aggrieved under Subsection 2.A., above, may raise the matter under a statutory procedure or the grievance and arbitration procedures provided in this Agreement, but not under both.

B. An employee shall be deemed to have exercised his option under this Section at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a written grievance under the provisions of this Agreement, whichever event occurs first.

C. Selection of the grievance and arbitration procedures contained in this Agreement in no manner prejudices the right of an aggrieved employee to request the Merit Systems Protection Board to review the final decision pursuant to Section 7702 of Title 5 of the United States Code in the case of any personnel actions that could have been appealed to the Board, or, where applicable, to request the Equal Employment Opportunity Commission to review a final decision in any other matter involving a complaint of discrimination of the type prohibited by any law administered by the Equal Employment Opportunity Commission.

Section 6. Except as provided in Section 5 above, any employee aggrieved under the provisions of this Article shall file his complaint under the grievance and arbitration provisions contained in this Agreement.

<u>Article 8: Position Descriptions and Classification Appeals</u>

Section 1. The position description is a written record of the principal duties and responsibilities assigned to a position and which comprise the work assigned to an employee. Position descriptions will clearly state what work is expected to be performed.

Section 2A. Position descriptions will state the principal duties, responsibilities and supervisory relationships in a manner necessary for proper classification.

B. Position descriptions are not expected to contain a comprehensive or exhaustive listing of each and every task or duty which is performed by an employee. These incidental and infrequent duties may be omitted from the position description or covered by a brief statement showing that other minor duties may be performed.

C. It is understood that this Section does not preclude management from assigning such duties as necessary to accomplish its mission in accordance with law.

<div align="center">***</div>

<u>Article 22: Investigations</u>

Section 1. This Article contains the policy and procedures to be followed when bargaining unit employees are the subjects of, or involved with investigative and administrative interviews. These policies and procedures will be followed by Agency and Union representatives and employees participating in these interviews/examinations. Agency representatives include CBP managers, supervisors, factfinders, and the Office of Professional Responsibility.

<div align="center">***</div>

Section 6. Employee Weingarten Rights. When any Agency representative is obtaining information from a bargaining unit employee, verbally or in writing that could lead to potential discipline or adverse action, the Agency representative shall advise the employee of his/her right to union representation prior to the commencement of questioning. This notice shall be on a form (see Appendix A-2) that the employee signs at the beginning of the interview and is witnessed by another Agency representative.

A. If the employee exercises his or her option to have union representation present, the employee will have a reasonable period of time to secure Union representation.

B. The arrangements made to accommodate Union representation in subsection A may not cause an unnecessary delay prompting an obstruction of the Agency's investigation.

C. Where a representative of the Agency denies an employee the opportunity to be represented by the Union during an interview, the employee will, upon request, be provided with the reason for the denial in writing.

D. Interviews that begin before or continue beyond the employee's regular duty hours shall constitute hours of work and be compensated.

E. The Agency will annually inform employees of their rights under 5 U.S.C. § 7114 (a) (2) (B).

<center>***</center>

Section 12.A. In any interview where the employee is not the subject of a criminal investigation, or when an employee has been advised of his/her rights under Section 10., above, the Agency representative has the authority to inform the employee that:

(1) The employee must disclose any information known to him concerning the matter being investigated;

(2) The employee must answer any questions posed regarding any matter which has a reasonable relationship to matters of official interest and may properly refuse to answer questions regarding matters in which the Agency has no official interest;

(3) The employee's failure or refusal to answer such questions may result in disciplinary or adverse action; and

(4) A false answer to any such question may result in criminal prosecution.

(5) The employee may discuss the matters raised in the interview with the Union but not with other employees until the investigation is completed.

B. When an employee refuses to answer a question in accordance with this section, the Agency representative shall inform the employee of his/her obligation to answer.

Section 13.A. Employees have the ability to secure an NTEU representative to participate in all phases of the investigative interview in accordance with this Article. When the person being interviewed is accompanied by a representative furnished by the Union, in both criminal and non-criminal cases, the role of the representative includes, but is not limited to the following rights:

(1) To clarify the questions;

(2) To clarify the answers;

(3) To assist the employee in providing favorable or extenuating facts;

<center>6</center>

(4) To suggest other employees who have knowledge of relevant facts; and

(5) To advise the employee.

<center>***</center>

<center>Article 46: Adverse Actions</center>

<center>***</center>

Section 2.  An adverse action for the purposes of this is defined as a removal...

Section 3.  Adverse actions taken against an employee will be for such cause as will promote the efficiency of the service.  Adverse actions will be taken in a manner that is fair and impartial, and timely (i.e., so as not to create an unreasonable delay that materially prejudices the employee).

Section 4.  Adverse action penalties will be imposed to correct behavior, teach the employee and others that certain actions are unacceptable for an employee of CBP, and to demonstrate and support the expected high standards of conduct for CBP. As such, adverse actions under this article shall generally be progressive in nature, and will give appropriate consideration to the criteria contained in Appendix D: Douglas Factors.

 Section 5. Procedures for effecting adverse actions are as follows:

A.  The employee will be given thirty (30) calendar days advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reason(s) for the proposed action. With the notice, the employee will be provided, to the extent such information exists and is related to the action, a copy of those portions of all written documents and recordings, which contain information or evidence relied upon by the Employer as the basis for the action, those portions of written documents and recordings that are favorable to the employee, and the investigative report. In addition, in the event the Employer reviewed video or audio surveillance recordings in proposing the action, such recordings will be made available for review by the employee, and portions provided upon request. (emphasis added).

B.  The employee will be given fourteen (14) calendar days from receipt of the notice and supporting material to present an oral and/or written reply to the proposed action. The employee will have the right to be represented by the Union, or by an attorney or other representative of his own choosing in connection with the oral and/or written reply. Extensions of the reply period may be made by mutual agreement of the parties. All extensions granted will be confirmed in writing or electronic mail.

(1) Oral Replies:

<center>7</center>

(a) Absent just cause, any request for an oral reply must be made within seven (7) calendar days of receipt of the notice of proposed action.

(b) Upon request by either party, oral replies will be presented in person. By mutual agreement, oral replies may be provided by telephone or other technological means (including video teleconferencing).

(c) Oral replies will generally be heard at or near the employee's duty location, and CBP will provide time and reimburse the employee and his or her Union representative to travel to and from the oral reply location.

(d) In the event management elects to hold the oral reply at a location outside the employee's duty location, CBP will be responsible for all travel and per diem costs, as well as time for the employee and his or her Union representative to travel to and from the oral reply location.

\*\*\*

(2) Written replies must be received by the designated official prior to the end of the fourteen (14) calendar day reply period.

C. After receipt of the written and/or oral reply...the Employer will issue a final decision...

\*\*\*

## Appendix D:  Douglas Factors

…Deciding officials will give appropriate consideration to the below criteria, parentheses Douglas factors and parentheses, when deciding the appropriate penalty for employee misconduct:

(1) The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional, or technical, or inadvertent, or was committed maliciously, or for gain, or was frequently repeated;

(2) The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

(3) The employees' past disciplinary record;

(4) The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) The effect of the offense, the effect of the offense on the employee's ability to perform at a satisfactory level, and its affect upon supervisors, conduct confidence in the employee's ability to perform assigned duties;

8

(6) Consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) Consistency of the penalty with any applicable agency table of penalties;

(8) The notoriety of the offense or its impact upon the reputation of the agency;

(9) The clarity with which the employee was on notice of any rules that were violated in community offense, or had been warned about the conduct in question;

(10)   Potential for employees, rehabilitation;

(11)   Mitigating circumstances surrounding the events such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter and

(12)   The adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employer or others.

In considering these factors, however, it should be noted that they do not necessarily have equal weight, may not apply in every situation, and in some instances may even constitute aggravating circumstances. Selection of an appropriate penalty must us involve a responsible, balancing of the relevant factors in the individual case.

JE 1.

**B.  Agency Policies**

<u>Standards of Conduct</u>
(CBP directive number 51735–013A)

\*\*\*

3.  INTRODUCTION

3.1 In fulfilling its mission, CBP and its employees must sustain the trust and confidence of the public they serve. All employees must maintain high standards of honesty, integrity, impartiality, character, and professionalism to ensure the proper performance of government business, and the continued trust and confidence of the public…

3.2 Certain conduct, on or off duty, may subject employ to appropriate disciplinary action… For example:
  • Failing to conform to the standards or related statutes and regulations,
\*\*

- Directly and negatively impacting the job performance of an employee…or management's trust and confidence in an employee's job performance.
- Adversely affecting or interfering with the accomplishment of CBP's mission.

\*\*\*

5.  RESPONSIBILITIES

\*\*\*

5.7 Every CBP employee is required to: (1) know the standards of conduct and their application to his her behavior; (2) seek clarification from his or her supervisor if unsure of the application of the standards of conduct; (3) adhere to the Standards of Conduct; and (4) be aware of the consequences of violation...

\*\*\*

6.  STANDARDS OF CONDUCT

6.1 CONDUCT PREJUDICIAL TO THE GOVERNMENT. Employees will not engage… in dishonest… conduct or any other conduct prejudicial to the government.

6.2 PROHIBITED ACTIONS. Employees will avoid any action… which might result in, or easily create the appearance of:

\*\*\*

- Engaging in activities, which would conflict with official government duties and/or responsibilities or adversely interfere with accomplishment of the mission of CBP.

6.3 INTERGRITY RELATED MISCONDUCT. Integrity is one of the CBP's core values and is essential to the effective functioning of CBP. As an agency charged with law-enforcement activities, it is imperative that CBP employees demonstrate high standards of integrity. Only by each and every employee maintaining the highest standards of integrity and professionalism can CBP keep the public trust and confidence that are critical to the accomplishment of law-enforcement, hold out online security, and other missions.

\*\*\*

6.4  FALSE STATEMENTS

6.4.1 Employees will not knowingly make false, misleading, incomplete, or ambiguous statements with her oral or written, in connection with any matter of official interest.

6.4.21 When directed by proper authority, employees must truthfully and fully testify, provide information, and respond to questions (under oath

when required) concerning matters of official interest that are being pursued administratively.

<center>***</center>

6.7 GENERAL CONDUCT

<center>**</center>

6.7.2 Employees are required to perform their duties to the government and the public consciently, respond readily to the lawful direction of their supervisors, and follow agency policies and procedures.

JE 2. <u>See also</u>, JE 3

<center><u>Table of Offenses and Penalties</u></center>

<center>**</center>

This Table of Offenses and Penalties (Table) serves as guide...in assessing the appropriate penalties for common types of misconduct...The Table is provided as a guide, not as a set of mandatory rules; it does not relieve supervisors and managers of the responsibility of using good judgement when taking corrective action.

TABLE OF OFFENSES AND PENALTIES STRUCTURE:

<center>***</center>

RECOMMENDED PENALITES: The Table uses four (4) columns to cover the range of penalties. The first column is the recommended penalty for the first offense. The second column provides a recommended penalty range, where the circumstances of the case allow for mitigation. The third column provides the recommended penalty range, where the circumstances of the case include aggravating factors. The fourth column provides the recommended penalty range for subsequent offenses. The Table is a guide to help ensure a consistent application of similar penalties for similar offenses, but the selection of penalties should always be appropriate to the facts of the case.

Due regard shall be given to the principle that similar penalties should be imposed for similar offenses. At the same time, the penalty for misconduct may be elevated above the recommended penalty were an employee has engaged in past misconduct, or extenuating circumstances are present…When, using the Table, proposing, and deciding officials should use the "Subsequent Offenses" column to select a penalty when also considering past misconduct. Additionally, when aggravating circumstances are present, the proposed and deciding officialss should use the "Aggravated Range" column to select a penalty

<center>**</center>

<center>11</center>

TAKING A DISCIPLINARE ACTION:
<div align="center">***</div>
Finally, the penalty for misconduct may be less severe than those set forth in the Table, as within the range for the offense, but only after full and fair consideration of all available information. Supervisors and managers should never lose sight of the fact that the table is a useful guide, but it cannot replace reason or judgment.

…The Merit Systems Protection Board (MSPB)…identified a number of factors— generally referred to as the "Douglas factors"—that must be considered an taking an adverse action. CBP has elected to also give a proper consideration to these factors, when taking disciplinary actions. As a result, for all formal discipline (e.g., reprimand, suspension, removal) supervisor/manager should be prepared to demonstrate that bracket [these] factors. where applicable, were considered... (Emphasis original)
<div align="center">***</div>

JE 4:383-414.

## V.   Facts

### A.   Introduction

The hearing was conducted remotely using a video conference platform on January 12-13, February 28, March 1 and 28 of 2023.  It concerns the Agency's April 10, 2022 decision to remove the Grievant for a "lack of candor" for allegedly failing to answer questions truthfully regarding the legal status of a sister, Martha Beatriz Rios Cardenas ("Bety"[3]).  JE 5.

The alleged specifications used to support the Grievant's removal were based on his responses to his 2019 e-QIP, a personal subject interview that occurred on August 16, 2019, and an interview conducted with the Office of Professional Responsibility (hereinafter "OPR") on December 6, 2021.  Id.  The three specifications were:

Specification 1: On or about July 12. 2019, you failed to list your sister, Martha Beatriz Rios Cardenas, a.k.a. Bety Rios, as required in Section 18 - Relatives of your Electronic Questionnaire for Investigation Processing (e-QIP), which is part of your periodic background investigation required for employment with CBP. You certified the veracity and completeness of your responses during your Person Subject Interview (PSI) on August 16, 2019. Yet, you failed to list your sister Martha Beatriz Rios Cardenas, a.k.a. Bety Rios.

Specification 2: On or about July 12. 2019, you failed to list your sister, Martha Beatriz Rios Cardenas, a.k.a. as Bety Rios, as required in Section 19 - Foreign Contacts of your Electronic Questionnaire for Investigation Processing (e-QIP), which is part of your periodic background investigation required for employment with CBP. You certified the veracity and completeness of your responses during

---

[3]   "Bety" is the Grievant's older sister and was been referred to in the record as Martha Beatriz Rios Cardenas, Martha Beatriz, and Bety Rios.

your Person Subject Interview (PSI) on August 16, 2019. Yet, you failed to list your sister, Martha Beatriz Rios Cardenas, a.k.a. Bety Rios.

Specification 3: On December 6, 2021, during official interview with CBP Office of Professional Responsibility (OPR) Agents, you were questioned about your sister Ms. Martha Beatriz Rios Cardenas, a.k.a. Bety Rios. You were specifically asked if your sister Bety Rios was a U.S. citizen, to which you responded that you were not aware of your sister's immigration status. During further questioning, you said that you were not sure of her status, and then repeatedly stated that you did not know her status. You were also questioned with respect to your responses during your background investigation and you stated your answers were accurate. You were asked if your sister was currently living with your parents. You responded that you did not know. However, after the OPR Agents repeated the question, you said that you see her there when you visit your parents. After an interview recess, you told the Agents that you remembered she was not a U.S. citizen. You were also asked if your sister is currently living in Mexico, or the U.S. and you responded you did not know where she is living. However, you admitted to having contact with her. You failed to provide truthful responses to OPR during your interview.

Id.

The Grievant was born in Laredo, Texas, but grew up in Nuevo Laredo, Mexico[4] where his first language was Spanish. Tr. 5:120-121.   The Grievant has a total of five siblings, four sisters and a brother. Id. at 122.  Bety, the subject of this case, is 16 years his senior and did not grow up in the same household as Mr. Rios. Id. at 123.  The Grievant moved to the United States with his parents and brother Jose Rios Jr. in the early 1990s. Id. at 122.  Bety did not accompany the family to the United States. [5] Id. at 123.

The Grievant began his service as a Customs and Border Protection Officer ("CBPO") position September 22, 2014 and was stationed in Laredo, Texas Port of Entry. Tr. 5:109.  The Grievant's performance prior to, and after, the actions that were the basis for his removal were satisfactory. Tr. 3:142.  There was no presentation of any prior discipline. Id. at 143.

As part of his employment, the Grievant had to complete an Electronic Questionnaires for Investigations Processing[6] ("e-QIP") form prior to becoming employed as a CBPO and, then, periodically thereafter.  An e-QIP contains twenty-nine (29) sections. JE 7:460, 8:558.   The form provides that the respondent will answer all questions "completely and truthfully" and "failure to answer any questions completely and truthfully could result in an adverse personnel action...including loss of employment."  JE 7 and 8:527-560.

---

[4]    Nuevo Laredo, Mexico is across the Rio Grande from Laredo, Texas.  Tr. 5:120.

[5]    Once he arrived in the U.S., the Grievant enrolled as a ninth grade student taking English as a second language course.  Id. at 121.

[6]    See, https://www.cbp.gov/careers/car/e-QIP.  See also, Completing your Investigation Request in e-QIP: Guide for the Standard Form (SF) 86, July 2018. https://www.dcsa.mil/Portals/91/Documents/pv/mbi/standard-form-sf-86-guide-for-applicants.pdf.

**B.  2013 e-QIP**

On May 21, 2013, the Grievant submitted responses to his initial e-QIP ("2013 e-QIP") required for his employment as a CBPO. JE 8:527.  Prior to responding to the questions listed on the e-QIP, the Grievant acknowledged, by selecting "Yes," the following:  "I have read the instructions and I understand that if I withhold, misrepresent, or falsify information on this form, I am subject to the penalties for inaccurate or false statement (per U.S. Criminal Code, Title 18, section 1001), denial or revocation of a security clearance, and/or removal and debarment from Federal Service."  JE 8:531.  He also verified the accuracy of the information he provided prior to submitting the form.  Id. at 527 and 611.

The Grievant's answers to Sections 18 and 19 of the e-QIP are the sections that are relevant in this case.

Section 18 requires individuals to list "all relatives, regardless if they are living or deceased." Id. at 541.  The person completing the form can choose from the following relatives options: mother, father, stepmother, stepfather, foster parent, child (including adopted/foster), stepchild, brother, stepbrother, stepsister, half-brother, half-sister, father-in-law, mother-in-law, and guardian.  Id.  The Grievant's responses to Section 18 of the 2013 e-QIP listed the following relatives:

1. Mother – "Rios", born in Durango, Mexico, who possesses a U.S. Alien Registration, residing at 716 Buffalo Court, Laredo, Texas, with whom Mr. Rios approximates having bi-weekly contacts.
2. Father – "Rios", born in Michoacan, Mexico, who possesses a U.S. Alien Registration, residing at 716 Buffalo Court, Laredo, Texas, with whom Mr. Rios approximates having bi-weekly contacts.
3. Child – "Rios", born in Laredo, Texas, and residing at 608 Pinos Circle, Laredo, Texas.
4. Brother – "Rios, Jose", born in Laredo, Texas, residing in Laredo, Texas.
5. Sister – "Garza, Alma Graciela", born in Laredo, Texas, residing at 716 Buffalo Court, Laredo, Texas.
6. Father-in-law – "Villarreal", born in Laredo, Texas, residing in Laredo, Texas.
7. Mother-in-law – "Villarreal", born in Nuevo Laredo, Mexico, who possesses a U.S. Alien Registration, residing at 716 Buffalo Court, Laredo, Texas, with whom Mr. Rios approximates having bi-weekly contacts.

Id. at 542-48.  He certified that he did not have any other relative to list.  Id. at 548.

Section 19 of the e-QIP requires individuals to disclose if they...have, or have...had, close and/or continuing contact with a foreign national within the last seven (7) years with whom you, or your spouse, or cohabitant are bound by affection, influence, common interests, and/or obligation.  Include associates as well as relatives, not previously listed in Section 18.

Id. The Grievant's response to Section 19 of the 2013 e-QIP disclosed one foreign contact, "Gloria Isabel Rios – Sister."  Id.   The Grievant certified not having any additional foreign contacts that qualified under Section 19.  Id.

14

On March 11, 2014, during a follow-up personal interview conducted, the Grievant confirmed the omission of two sisters living in Mexico from Section 18 and 19.[7] JE 8:561-5.

The Grievant has testified at the arbitration hearing that he was unaware that Section 18 required a listing of all his family members. Tr. 8:135. See also, Id. at 23-24. The Grievant further testified that he believed only foreign relatives with whom he had a "close and/or continuing" relationship within the past seven years were required to be disclosed in Section 19. Id. As a result, he included his sister Gloria Isabel Rios in his 2013 e-QIP because she assisted him with wedding planning in Mexico and he petitioned on behalf for her legal permanent residency. Tr. 5:173-174. Consequently, he added the following information of his sisters:

1. Marta Beatriz Cardenas [aka Bety]– Sister, Mexican citizen, residing at Sierra Mexicali 319, Nuevo Laredo, Mexico, and born on October 3, 1962, in Durango, Mexico.
2. Lourdes Ines Gonzalez – Sister, Mexican citizen, residing at Sierra Mexicali 319, Nuevo Laredo, Mexico, and born on June 29, 1966, in Durango, Mexico.

JE 8:563.

The investigator in the matter, Guadalupe Martinez ("Investigator Martinez"), issued a Report of Investigation in which she referred to these admissions as "minor corrections [that] are needed to the SF-86." Id. at 561. The Grievant was not disciplined for not including all his sisters in Section 18 and 19 of the e-QIP. Id.

The Grievant undisputed testified at the arbitration hearing that Investigator Martinez never told him he had incorrectly completed Sections 18 and 19[8] and he only became aware of Investigator Martinez's Report of Investigation while preparing for this hearing. Tr. 5:138-140. See also, JE 8:564.

## C.  2019 e-QIP

On July 12, 2019, the Grievant was required to submit a new e-QIP ("2019 e-QIP") for his continued employment as a CBPO. JE 8:611-46. See also, JE 7. Prior to responding to the questions listed on the 2019 e-QIP, the Grievant again acknowledged that he understood he could be subject to removal if he were to "withhold, misrepresent, or falsify information on this form..." JE 8:617. He also verified the accuracy of the information he provided prior to submitting the form. Id.

On his responses to Section 18 of the 2019 e-QIP, Mr. Rios listed the following relatives:

1. Mother – "Rios, Maria", born in Durango, Mexico, U.S. permanent resident, residing at 716 Buffalo Court, Laredo, Texas, with whom Mr. Rios approximates having weekly contacts either in-person or telephonically.
2. Father – "Rios, Jose Sr.", born in Michoacan, Mexico, U.S. permanent resident, residing at 716 Buffalo Court, Laredo, Texas, with whom Mr. Rios

---

[7]    In the 2013 e-QIP the Grievant did not list two siblings, Bety and Gloria Isabel Rios ("Gloria"), under Section 18. JE 8:541-548. While he did list Gloria under Section 19, he did not list Bety under Section 19. Id. at 548.

[8]    In his report, Investigator Martinez admonished the Grievant for failing to include all trips to foreign countries whether he knows the specific dates of the trip. JE 8:563. Again, no discipline was imposed.

approximates having weekly contacts either in-person or telephonically.

3. Child – "Rios, Gael", born in Laredo, Texas, and residing in Laredo, Texas.

4. Brother – "Rios, Jose Jr.", born in Laredo, Texas, residing in Laredo, Texas.

5. Sister – "Garza, Alma Graciela", born in Laredo, Texas, residing in Laredo, Texas.

6. Father-in-law – "Villarreal, Rodolfo", born in Laredo, Texas, residing in Nuevo Laredo, Mexico.

7. Mother-in-law – "Villarreal, Maria Elva", born in Nuevo Laredo, Mexico, U.S. permanent resident, residing in Laredo, Texas, with whom Mr. Rios approximates having daily in-person contacts.

JE 8:627-34. He certified that he did not have any other relatives who qualified under Section 18. Id. at 634.

At the arbitration hearing, the Grievant testified that he did not include Bety under Section 18 of the e-QIP because he believed Section 18 was limited to "other relatives" who were U.S. citizens and Section 19 was limited to "foreign contacts" with whom he had "close and/or continuing contact" over the prior seven years. [9] Tr. 5:128-129, 132-134, 167 and JE 8:504.  See also, JE 8:634. He further explained that while he had five siblings (four sisters and one brother),[10]Bety was his oldest sibling and was 16 years his senior who "was doing her life apart from us." Tr. 5:123.  See also, Tr. 5:122, JE 6:431,457 and JE 8:561-5. He testified that he had "very little" to "no" relationship with Bety "...because we never bonded as sister and brother...just still my sister but that's about it" and that his contact with her when he was younger as "...like way back." Tr. 5:125-126.  He testified that he last spoke with her in late 2021 when he went to his parent's house to check on is mother's medical condition and he "bumped into [her]." Tr. 5:126.  And while he acknowledged that they were Facebook friends, his communication with her was "very limited." Tr. 5:126-127.  When asked what he meant by "very limited," he replied:

> Just once. Because I was actually looking for my parents. The thing is that usually I used to call them through the phone and see how they were....[T]hey didn't answer...So I, actually, I contact everybody, obviously, in the family, if they actually knew anything about them...And I actually send her a Facebook message but I never got the answer anyway, so. But that's...the only time I had contact with her.

JE 8:126-127.  He testified that he did not know where she was living at the time.  Id. at 127-128.

On August 23, the Agency administered a pre-employment polygraph examination to Nadine Nava ("Nava"), who was an applicant for a CBP position and the girlfriend of the Grievant's brother, Jose Rios Jr.  ("Jose") JE 6:428.  After failing that examination, the Agency

---

[9]    Similarly, the Grievant testified that he did not include Gloria in his 2019 e-QIP because their relationship was no longer close and/or continuous.  Tr. 5:148-149.

[10]    During follow-up personal interviews conducted on August 16 and September 20, 2019, the Grievant did not disclose having two sisters who are foreign nationals or corrected his responses to the 2019 e-QIP.  JE 8:611-46.

gave Nava the opportunity to provide a statement.[11]  Id.  Among the information Nava provided was that Jose had a half-sister named Bety who resided in the United States illegally, lives with Jose's parents and was working at a warehouse and as a babysitter.  JE 6:431.  There is no mention of the Grievant in the Nava affidavit.  Id.

On August 27, Special Agent ("SA") Charles Whiting reported to the Joint Intake Center ("JIC") an allegation that the Grievant claiming was aware of his sister living illegally in Laredo, Texas with his parents.  Id. at 431.  SA Whiting's email triggered an investigation by the CBP's Office of Professional Responsibility ("OPR").  Id. at 421.

### D.  2021 OPR Investigation

Approximately 27 months later, on December 6, 2021, the Grievant was interviewed by two SAs, SA Salmon and SA Donnelley from OPR via SKYPE.  JE 6, 11.  Due to COVID, the Grievant wore a mask throughout the interview.  Id. and Tr. 3:44.

On February 8, 2022 SA's Salmon issued their Report of Investigation ("ROI") and sustained the following four allegations:

ALLEGATION ONE: From June 2017 to present, [the Grievant] associated with his non-citizen sister.

ALLEGATION TWO: On July 12, 2017, [the Grievant] did not list his noncitizen sister on his equip periodic background investigation

ALLEGATION THREE: On December 6, 2021. [The Grievant] was untruthful and told 0PR/HOU that he did not know if his sister was a non-citizen

ALLEGATION FOUR On December 6, 2021. [The Grievant] admitted that his sister was not a US citizen.

JE 6:2.  In the ROI's "Narrative," SA Salmon reported the following:

*** 

SA Salmon asked [The Grievant] if he had a sister who resided at his parent's residence. [The Grievant] replied 'Yes, [Bety].'  [The Grievant also confirmed that Bety was his sister]. (Video time stamp omitted).

SA Salmon asked [the Grievant] if his sister Bety was a U.S. citizen. [The Grievant] stated that he was not aware of his sister's immigration status.… (Video time stamp omitted)

** 

SA Salmon asked [The Grievant] if his sister Bety was currently living with his parents. [The Grievant] replied that he did not know.  SA Salmon repeated the question, this time of the Grievant replied 'yes, when she is there.' (Video time stamp omitted)

---

[11]   The Union requested both Ms. Couch and Ms. Nava as witnesses but the Agency failed to produce either as a witness.  UE 5, Tr. 5:83.

> At this point in the interview, the Union Representative requested a break. When [the Grievant] returned, he stated that he remembered that his sister was not a U.S. citizen (Video time stamp omitted)
>
> SA Donnelly asked [the Grievant] if he last had contact with his sister, Bety. [The Grievant] replied that he last contacted her a month ago and he met with her in person. During the interview SA Donnelly asked [The Grievant] how he suddenly recall that his sister was a non-citizen. [The Grievant] replied, 'just remembered.' (Video time stamp omitted)
>
> SA Donnelly asked [the Grievant] if he knew where his sister was currently living. [The Grievant] stated that he did not know where she was living. SA Donnelly asked if his sister was living in Mexico or the U.S. [The Grievant] stated he did not know. (Video time stamp omitted)

<div align="center">***</div>

Id. at 4-5.

At the arbitration hearing, SA Salmon testified that, with regard to the Grievant's association with his non-citizen sister Bety:

> ...I think I asked him multiple times, he didn't know who his sister was. And then after he did, he said that he—well, at first he did say he didn't know his sister and didn't know the status. And then during the interview, I guess he also admitted that, you know, he had communications with her.

Tr. 1:39-40. He further testified that he believed the Grievant was in "continuous contact with his sister, who is a noncitizen" and that qualified as "regular contact." Tr. 2:16. When asked if it was important to know what the Grievant meant regarding his communication with Bety via Facebook, SA Salmon replied that:

> ...as long as I knew he was CBPO and he made contact, that's all I needed...that's what e-QIP said that that's what the CBP policy says, any foreign contacts from anywhere. It doesn't have to be Mexico, it could be anywhere in the United States, you have to report that.

Tr. 1:138-139. He agreed with the statement that "any association with a noncitizen is prohibited by CBP policy."[12] Id. at 139-140. See also, JE 3:372.

SA Salmon further testified at the arbitration hearing that "...I don't know how long for him to finally admit that his sister was a noncitizen…. I mean he was not being cooperative." Tr. 1:59-60. See also, Tr. Id. at 84-85 and 88. He agreed that his investigation "...corroborated that...[the Grievant] was aware of [Bety's] illegal status." Tr. Id. at 82. He did, however, also acknowledge that being a Mexican national that did not mean that the person is in the country illegally. Tr. Id. at 83. See also, Tr. 5:74-78 and AE 4-5.

---

[12]    Investigator Donnelly acknowledged that the CBP Standards of Conduct referred to a "close and continuous" association. Tr. 2:103.

### E.  Proposal Letter

On April 20, the Agency proposed that the Grievant be removed as a CPBO for "lack of candor."  JE 5.  After setting out the three Specifications that were the basis for the charge, the proposal letter also charged that:

> You failed to disclose required information pertaining to your sister, Ms. Martha Beatriz Rios Cardenas (Bety Rios) who was a Mexican national living in the United States illegally.  As a U.S. Customs and Border Protection (CBP) employee, you are expected to have the utmost integrity regarding official matters.  I considered that when you submitted your e-QIPs, you certified that the information contained therein was true and correct.  During your PSI, you also signed a document entitled "Oath, Unsworn Declaration, or Affirmation of Subject" where you swore under penalty of perjury that you were to provide information that was true and complete to the best of your knowledge.
>
> However, I considered that during your PSI on August 16, 2019, you verified as part of your answers that you did not have any associates or family members that have ever violated immigration laws.  You verified as well that you did not have any family members, friends or close associates who maintain any close and continuing relationship with anyone who has entered the U.S. illegally, or who resides in the U.S. illegally.  You verified these answers knowing that your sister, Ms. Martha Beatriz Rios Cardenas a.k.a. Bety Rios), was staying in the U.S. illegally.

Id. at p. 2.  The sections of the Standards of Conduct that were alleged to have been violated were Section 6.3 (Integrity-Related Misconduct), Section 6.4.1, Section 7.3, Section 7.4.1 and Section 7.4.2.  Id. at p. 3.  The proposing official went on to state that

> I have lost complete trust in your ability to carry on in your position as a law enforcement officer.  Your actions may have to be disclosed in criminal proceedings under the provisions of *Giglio* (citation omitted)...which would seriously undermine your credibility as an affiant or witness in a criminal case.  Therefore, it is possible that your actions have permanently damaged your ability to serve as a Government witness, which is an inherent part of your law enforcement positon.
>
> As such, I find that your conduct was extremely egregious and directly related to your duties, position and responsibilities.
> <div align="center">***</div>

Id.

The Proposing Official[13] testified at the hearing that she felt that the Grievant was very hesitant in providing answers and seemed to frequently misunderstand the question or answer a question that was not asked.[14]  Tr. 3:13.  She further testified that the Grievant attempted to mislead or be nonresponsive by answering "I don't know" to various questions Tr. 3:101.  For example, she testified that:

> And then throughout the video testimony you would hear him say he did not know her status and then he was uncertain of her status and then he said yes, I know she is not a U.S. citizen.  So I think the full lack of truthful information met the standards of lack of candor.

Tr. 3:31.  She acknowledged that someone's nationality does not equate to one's immigration status.  Tr. 3:92.  Hubbard also stated that "it is my testimony that I believe more likely than not he knew where his sister resided."  Tr. 3:59.  She explained that

> ...[the Grievant] visited his parents, that he had previously lived with them for a time, although not at present, that he would see his sister at his parents' house, and that there was the frequency of five but less than ten times a year that he would see his sister at this parents' house."

> I believe he said in his testimony that he saw her five or more times a year, that would be continuing in my definition of continuing contact.

Tr. 3:60-61.  See also, Tr. 3:32.

### F.  Union Reply and Agency Decision

On June 15, the Union submitted its response to the Grievant's proposed removal.  JE 8.  CBP designated Randy Howe ("Howe") the Director of Field Operations, Laredo Field Office, as the deciding official in this case.

On July 18, the Agency issued a decision letter upholding the removal for "lack of candor."  JE 9.  The decision letter was signed by Eugene Crawford.  Id.

---

[13]   Rita Hubbard ("Hubbard"), a Program Manager for the Agency's Office of Human Resources Management, was the Proposing Official.  Tr. 3:8.  She has served on the Disciplinary Review Board (DRB) as a collateral duty since 2016.  Tr. 3:9-10.

[14]   Hubbard explained why the DRB dropped the association charge that was sustained by the ROI:

> Well in the body of the recommendations that we made or the proposal that we made, these sustained allegations led to the offenses that we saw that led to a lack of candor and substantiated the proposed removal that we came to.  So there's a fine line that we're dancing here, because we didn't move to charge him with the association with a noncitizen, but we did find that these substantiated charges and the information he presented in his testimony supported the allegation or supported the recommendation that we made.

Tr. 3:56.  See also, JE 6:421.

**V.**    **Parties' Positions**

**A.  Agency's Position**

The Agency asserts that a preponderance of the evidence supports its decision to remove the Grievant because it promoted the efficiency of the service, among other things.   Agency Post-Hearing Brief at pp. 17-18.

First, the Agency maintains that proved, by a preponderance of the evidence, that the Grievant was guilty of a "lack of candor." Id. at p. 18.  The Agency reasons that, since the Grievant was informed that he incorrectly omitted Betty on his previous 2013 e-Quip form, he cannot claim ignorance or confusion about what was required on the 2019 e-QUIP form. Id. at p. 19.  In short, the Grievant's failure to Bety on Sections 18 and 19 of his 2019 e-QUIP Agency and his allegedly evasive answers maintains that it met the elements of a "lack of candor" charge, to wit:

> (1) Statements less than candid, truthful, accurate, or complete, involving deception;
> (2) Knowingly made or withheld. (Citations omitted)

Id. at p. 19.

The Agency characterized the Grievant's responses during the OPR Investigation as "inconsistent and incomplete." Id. at p. 15.  See also, JE 11. It cites the following exchanges as examples:

> Q. The allegation we got is that. . . she is a noncitizen.
> A. I don't know, man, I don't know.
>
> Q. Do you know if your sister is a noncitizen, has a green card, or?
> A. I don't know, . . . I don't know what is her status.
>
> Q. You don't know what's her status is or anything?
> A. No, negative, or words to that effect.
>                                         ***
> Q. You have no idea if your sister is a naturalized citizen or illegal/undocumented alien.
> A. No.
>                                         ***
> Q. Just want to make sure you have no idea what's the status of your sister is?
> A. No, no.
>
> Q. She's an American citizen or in the process of getting?
> A. I don't know what's her status, I am not asking those types of questions to my relatives.
>                                         ***
> Q. How long have your sister lived with your parents?
> A. I don't if she is living with my parents or not.

Q. You are telling me you don't know if your sister is living with your parents or not?

A. I know sometimes, they are there, she is there. But I don't know if she is living or not...I don't know, I haven't seen that. I can't tell how she has been there or not. I don't know what's going on.

[BREAK] – Union Representative asked for a break to confer with [the Grievant].

A. You asked me if she was a U.S. citizen or not, right.

Q. Yes, sir.

A. She is not, she is national Mexican but that's as far as I know.

Q. So, she is not a citizen.

A. No, she is not.

&ast;&ast;&ast;

Q. Last time you are being in touch with your sister.

A. I don't know man, maybe about a month.

Q. Was this in-person or phone?

A. In-person.

Q. How often do you see your sister?

A. If I see my sister when she is there at the house.

Q. How often do you see your sister? More than once a month, or less than once a month?

A. Less than once a month.

Q. Less than ten times a year or more than ten times a year?

A. Less than ten times a year.

Q. More or less than five times a year?

A. Approximately five times a year.

(Citations omitted) Agency Post-Hearing Brief at pp. 16-17. Specifically, the Agency characterized the Grievant's responses as "less than candid" and noted, in particular, that the Grievant changed his answer from not knowing Bety's status in the U.S. and her citizenship to, after speaking with his Union representative, "...knowing that his sister was not a U.S. citizen, but a Mexican national." Id. at p. 17. In sum, according to the Agency, this case is properly characterized as a "lack of candor" case because such cases are based on "...an employee's responses [that] are less that fully responsive, and while not explicitly untrue, deliberately convey a misleading expression (i.e., involves some deception) and, as such, such misconduct is broader than a falsification charge." (Citations omitted). Id. at pp. 19-20.

Second, the Agency contends that the Grievant's removal promoted the efficiency of the service. Id. at p. 21. Most pointedly, a "lack of candor" violation impact an officer's ability to serve as a witness. (Citation omitted). Id. at pp. 22-23.

22

Third, the Agency maintains that removal was the appropriate penalty in this case.  Id. at p. 23.  It bases its assertion on the assumption that some deference must be given to management's decision:

> ...A penalty imposed by an agency will be reviewed 'only to determine if the agency considered all the relevant factors and exercised management discretion within the tolerable limits of reasonableness.'  The penalty should not be disturbed 'unless it exceeds the range of permissible punishment or is 'so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion.'  This is because 'penalty decisions are judgment calls best left to the discretion of the employing agency.' (Citations omitted).

Id.  Moreover, the Agency's decision to remove the Grievant was reasonable since the recommended penalty for a first "lack of candor" offence pursuant to the Agency's table of offenses and penalties is removal, with a mitigated range from fifteen-day suspension to removal, and an aggravated range of removal.  Id. at p. 24.

Moreover, application of the Douglas Factors militates in favor of the Grievant's removal.  For example, "[t]he nature and seriousness of the ["lack of candor'] offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated" supports the Agency's removal decision.  Id.  Moreover, according to the Agency, "[t]he employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position" relate to the Grievant's obligation as a federal law enforcement officer to "...maintain high standards of honesty, integrity, impartiality, character, and professionalism to ensure the proper performance of government business and the continued trust and confidence of the public."  Id. at p. 24.   And, as noted earlier, the Agency insists that "[t]he effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties."  Id. at p. 25.  Lastly, the Agency argues that, based on his similar omission on his previous 2013 e-QIP previous, there is sufficient reason to conclude that the Grievant was clearly "...on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question."  Id. at p. 26.

In sum, the Agency asks that its decision to remove the Grievant not be disturbed and that this grievance be denied.

## B.    Union's Position

The Union, however, asserts that the Agency improperly terminated the Grievant for lack of candor in violation of the parties' Agreement.

First, it challenged the OPR's December 6, 2021 investigation.  For example, it characterized the SAs questions as "compound" and "confusing."[15]  Union Post-Hearing Brief at

---

[15]    In a memos dated April 19 and November 23, 2021, the Agency sent out a memo clarifying terminology for CBP communications. UE 3.   NTEU Vice President Campos testified that he believed the memos were only provided to higher up or special targeting groups and not CBPOs like the Grievant.[15]  Tr. 5:78-80.

25, 58-59.  It also argued that, when asked, the Grievant repeatedly stated that he was not aware of Bety's current immigration status.[16]  It cites the following exchanges as examples:

> Q:  So, the allegation that we got is that your sister lives there at the residence we just discussed 716 Buffalo and that she is a noncitizen?
> A:  I don't know, man, I don't know.
> Q:  Do you know if your sister is a noncitizen or if she, has a green card, or…?
> A:  I don't know….(inaudible)…I don't know what's her status in this country.
>                                       ***
> Q:  So you don't know what her status is or anything?
> A:  Negative.
>                                       ***
> Q:  So you are telling me you have no idea if your sister is a naturalized citizen or illegal--an undocumented alien?
> A:  No (while shaking head no)
>                                       ***
> Q:  I just want to make sure that you have no idea what the status of your sister is?
> A:  No (while shaking head no)…
> Q:  If she's an American citizen or in. the process of getting….
> A:  No, I don't know actually (while shaking head no).  I can tell you like for sure I don't know what's the status of them in this case ….I'm not asking those type of things to my relatives…you know what I mean.
> Q:  Yes Sir.
>                                       ***
> Q:  Basically the question is it's kind of hard… I mean……I know you can't run your sister and stuff but it's kind of hard to like…If my brother lived with me I would know if he was legal resident or illegal?
> A:  Yes I understand but I like I said I'm not asking those type of questions but I'm not saying you….
>                                       ***
> Q:  Could it be possible that she's an undocumented noncitizen?
> A:  I don't know.  I'm not going to say if she is or is she's not.  I don't know.
>                                       ***
> A:  You asked me if she was a U.S. Citizen or not right?
> Q:  Yes sir.
> A:  Ok.  Yeah, like she's not a US citizen obviously what I know she's a national Mexican but that's as far I know.
> Q:  So she's not a citizen right?  No she's not.
>                                       ***
> Q:  Is she trying to get her residency, do you know sir is she in the process of getting her residency do you know?
> A:  I don't know about that.
> Q:  You have no idea?

---

[16]  The ROI included a document that referred to Form "I-485."  See, JE 6:457.  Union Steward Campos testified that immigrants use these forms to apply for an adjustment of status.  Tr. 5:82.  He further testified that an I-485 form could be looked up on the UCIS public page to determine Bety's immigration status.  Id.

A:  No.

<center>***</center>

Q:  Do you know if your sister is illegally in the United States?

A:  No.  I already told you.  No.

Q:  Do you know if your sister is working illegally in the United States?

A:  No, I don't know

(Citations omitted)  Id. at p. 10.

The Union also characterized the Grievant's answers during the 2021 OPR investigation as consistent with regard to his lack of knowledge of Bety's living arrangements.  It cites the following exchanges as examples:

Q:  Is your sister currently living at this [his parent's] now?

A:  As far as I know (shakes head no)[17]

<center>***</center>

Q:  So how long has your sister lived here then?

A:  What was that again?

Q:  How long has your sister lived in Laredo then?

A:  What do you mean?

Q:  How long has your sister lived with your parents?

A:  I don't know.  I don't know if, if she's living with my parents or not.  I don't know what the question….(inaudible)

Q:  So you're telling me that you don't know if your sister is living with your parents or not?

A:  Yeah.

Q:  You don't have no idea?

A:  No no no…I know that sometimes when they're there, she's there but I don't know if she's living or not…and they're telling me that she's taking care of kids…like I don't know like..(inaudible)….I haven't seen that so I cannot say how long she's been there or not…like I don't know….that's putting me in a spot because I don't know exactly what's going on.

<center>***</center>

Q:  When was the last time that you've been in touch with your sister?

A:  I don't know man.  I was in ….maybe…like a month;

Q:  How were you in contact with her…in person or do you (inaudible)?

A:  What was that?

Q:  When you were in contact with her was it via phone?

A:  No no….when I visit my parents and I saw her and whatever this or that.  But that's about it….but obviously just whenever….

Q:  So the answer to my question would be in person?

A:  Yes in person…

Q:  So how often do you see your sister?

---

[17] The Grievant testified that in this instance he wanted to say no but instead he shook his head and forgot to say no verbally.  Tr. 5:155.

<center>25</center>

A:  If I see my sister it's because she's visiting or she's there at the house with my parents.

Q:  Sir sir just please answer my questions? How often do you see your sister?

A:  Not that often.  I don't see her that often.  Like I said.

Q:  More than once a month?

A:  Less than once a month because I don't see her.

Q:  Less than ten times a year or more than ten times a year?

A:  I can say Less than 10 times a year.

Q:  More or less than five times?

A:  Maybe more or less five times a year.

Q:  So approximately five times a year, you see your sister, or you communicate with your sister?

A:  What was that?

Q:  More or less five times a year approximately you communicate with your sister?

A:  Approximately just five times a year;

***

Q:  Where does your sister live now?

A:  I don't know like I don't know where she lives.

Q:  You talk to your sister five or six times a year and you don't know where she lives.

A:  I don't visit her.  Like that's….

Q:  I didn't ask if you visited her, I asked do you know where she lives.

A:  No, No I don't know where she lives.

Q:  So when you talk to her you don't know if you're calling Mexico or if you're calling the United States?

A:  What? I didn't get that.  What?

Q:  Does your sister live in the United States or Mexico?

A:  Like I said I don't know if she lives in Mexico or if she lives in Laredo Texas….I don't know.  I don't ask her hey what's going on.  I don't put myself asking that type of questions to my family.

Q:  Just for the record, you're going to sit here and tell me you talk to your sister but you have no idea if she's lives in this country or she's living in another country?  That's what you are telling me?

A:  As far as I Know….

Q:  Just yes or no.  Is that your statement here today?

A:  What was that?

Q:  Is your statement to me today that when you speak to your sister you don't know if she's in the United States or she's in Mexico and you have no idea where she resides?

A:  No

Q:  Is that your statement to me now?

A:  Yeah.

***

Q:  Have you ever spoken to your parents about your sister and where she lives?

A:  No.

Q:  Do you know if you sister is in the United States right now?

A:  No.
Q:  You don't know?
A:  No.

                     ***

Q:  You said before she was living with your parents, now you told my colleague you don't where she lives. But I have people telling me that she's babysitting…
A:  I didn't say that she is living with my parents.
Q:  You did at the very beginning sir.
A:  No, she was not.  I didn't say anything that she was living with my parents.  I said I don't know where she lives.

(Citations omitted)  Id. at p. 14.

The Union also characterized the Grievant's answers during the 2021 OPR investigation as consistent with regard to his "very limited" contact with Bety, indicating it was fewer than five times a year.[18]  Id. at p. 3.  See also, Tr. 5:125.  It cites the following exchanges as examples:

Q:  Growing up did you live with your sister?
A:  No.
Q:  Where did you live and where did she live?
A:  Where do I Live?  What do you mean? She was in Nuevo Laredo, Mexico?
Q:  She was in Mexico and you lived in the United States?
A:  I was…when I was…ummmm… like around from…my first years till maybe 13, I was living with my parents in Nuevo Laredo and she was separate from us? (inaudible)….and then we came out to the U.S…obviously;
Q:  Then you came to the United States?  Around 12 or 13?
A:  Like around…Cause I started actually middle school….
Q:  Hold on….Did your sister come with y'all when you moved to the U.S.?
A:  No.
Q:  She stayed in Mexico?
A:  Yes.  That's the thing she was not living with us….
Q:  Ok.  Let me finish my questions.  You came to the United States with your parents and she stayed in Mexico?  Is that correct?
A:  Yes
Q:  When do you remember seeing her in the United States?
A:  What do you mean like...inaudible?
Q:  Yes.
A:  Since she was living there in Nuevo Laredo, she was coming on and off, as far as I know because obviously she had that visa or whatever that…I understand I understood she had….she had a visa.
Q:  What kind of visa?
A:  If I'm not mistaken….a regular visa…I don't know.  I haven't seen her visa… But as far as I know she had a visa.
Q:  What kind of visa would she have?

---

[18]   The exact nature and time frame of their other communications was unclear.  For example, it was never clarified whether the Facebook communications were included as part of his five total contacts with Bety per year.

> A: Like I haven't….Physically I haven't seen it
>
> Q: I didn't ask you if you'd seen it I'm asking do you know type of visa did she have?
>
> A: No
>
> Q: You don't know but you know she was coming back and forth into the United States?
>
> A: Not often. I've seen her…to visit my parents (audible) as far as I know that's about it.
>
> Q: So she was coming back and forth to the United States *back then* to see your parents? (emphasis added)
>
> A: Nods yes.[19]

(Citations omitted). Union Post-Hearing Brief at p. 15.

Second, the Union argues that

> The Agency violated due process when the Deciding Official did not properly consider the Union's oral and written replies, and when the deciding official considered an aggravating factor not included in the proposal letter in deciding on removal.

Id. at p. 37. To support its claim the Union maintains that "[a]dvance written notice of the reasons for the proposed removal and an opportunity to reply to the stated reasons before the agency makes its final decision constitute fundamental due process guarantees." (Emphasis original, citation omitted) Id. Relatedly, the Union underscores the need to for the deciding official[20] to consider aggravating factors and provide some indication that what weight, if any, was given to those factors. Id. See also, Id. at pp. 39-40. The Union also maintains that the Decision Letter improperly included a factor (i.e., that the Grievant failed opportunity to respond to, and/or correct, his answers on the PSI) that was not part of the initial proposal letter and, as such, denied the Grievant's due process rights.[21] See, Id. at 42-43. As such, the Union asserts that the Agency's decision is fatally flawed because it denied the Grievant's due process guarantees. Id. at p. 38.

Third, the Union asserts that "CBP failed to prove by a preponderance of the evidence that it had just cause to remove J Jesus Rios from his CBPO position." Id. at p. 44. The Union bases this assertion on several factors. One is the applicable law. It notes that:

> In order for the Agency to sustain an adverse action based on employee misconduct, it must prove by a preponderance of the evidence each of the

---

[19] The Grievant testified that at this point in his testimony he was referring to when he had just moved to the U.S., and he saw Bety visiting their parents. Tr. 5:161-162.

[20] The Union notes that Randy Howe, the Director of Field Operations at the Laredo Field Office was the designated deciding official in this case, another person (Eugene Crawford) signed the decision letter, did not attend the oral reply nor testify at the arbitration hearing. Id. at p. 39. Moreover, the Union asserts that the Agency violated the NCBA by failing to provide an "'in-person' oral reply or to produce a recording without a transcript." Id. at p. 42.

[21] This is particularly troublesome, according to the Union because it was not previously raised in the proposal letter. Id. at p. 43.

following three elements. First, the Agency must prove that the employee actually committed all elements of the alleged misconduct. Second, the Agency must prove a sufficient nexus between the proven misconduct and the efficiency of the service to sustain the adverse action. Third, the Agency must prove that the particular penalty imposed, in the instant matter removal, has been appropriately chosen for the specific conduct involved and is based on a consideration of all factors relevant to promotion of service efficiency; in other words that the penalty selected is reasonable. (Citations omitted). The Agency bears the burden of proving, by preponderant evidence, each element of its charge, and its failure to do so will cause the charge to fail.

In order to prove a "Lack of Candor" charge, an "agency must produce some evidence" that the employee's actions, under the circumstances, "involved an element of deception." The Agency's Table of Offenses and Penalties indicates that the charge includes elements of deception, of failing to provide complete, honest answers to investigators. JE 4 Section (E). To sustain a charge of "Lack of Candor," then, the Agency must prove (1) that Officer Rios' answers were false, not the complete truth, or that he withheld information, and (2) that Officer Rios intended to deceive investigators with his answer.

At its core, the charge of Lack of Candor means a lack of truthful testimony or hiding the relevant facts or circumstances...

To sustain a charge of "Lack of Candor," then, the Agency, here, must prove by a preponderance of the evidence (1) that Officer Rios's answers were false, not the complete truth, or that he withheld information, and (2) that Officer Rios intended to deceive investigators with his answer.

Id. at pp. 45-46. The Union declares that "the failed to prove that [the Grievant] engaged in a Lack of Candor." Id. at p. 46.

For example, regarding Specification 1, the Union explains that the Grievant misunderstood that Section 18 required him to list all of his siblings and was independent of Section 19. Id. at p. 47. Indeed, the Union observes that the Grievant made the same mistake on his last e-Quip form in 2013 and corrected it when it was pointed out in 2014 indicating no intent to deceive, but simply a "misinterpretation." Id. at pp. 47-48. Moreover, the fact that the 2013 error was treated as a "minor correction" and that an Agency Investigator "...did not admonish [Grievant] for failing to include all his sisters" or "tell [the Grievant] that he completed Sections 18 and 19 incorrectly" bolsters its position that the Agency overstepped in this case. Id.

The Union further notes that Specification 1's (i.e., e-Quip Item 18) reliance on the veracity and completeness of the Grievant's PSI is misplaced. Among the Union's reasons are: (a) there was no evidence that the Grievant was given an opportunity to correct any information on the PSI and (b) the PSI included inaccurate information

The Union dismisses Specification 2 (i.e., e-Quip Item 19) on the grounds that the Grievant's relationship with Bety did not involve "close and/or continuing contact" for the past seven years. The commented that the Agency's witnesses relied on varying definitions of what constitutes "close and/or continuous contact." Id. at p. 51. Moreover, the nature of the Grievant's "five contacts" with Bety were never adequately explored by the Agency. Id. at 52.

Instead, the Union opines that the Grievant's relationship with Betty was "non-existent" and that he had "very limited communication with her." Id.

The Union rejects Specification 3 (i.e., the OPR investigation) on the grounds that the Grievant was not evasive and the subject of overzealous investigator. For example, the Union cites the consistency of the Grievant's responses (e.g., not having knowledge of her legal status) and the inaccurate (e.g., that he allegedly "waffled" when asked where Betty lived,), compound (e.g., simultaneously asking if Betty was a noncitizen and if she lived with his parents) and vague (e.g., failing to define the timelines discussed) nature of the investigator's questions. Id. at pp. 54-58. Moreover, the Union also maintained that the investigators repeatedly cut the Grievant off and did not allow him to explain his answers. Id. at p. 58-59. In short, the investigation grew scorn from the Union as a "very poor investigation," because the investigators had pre-determined the Grievant's guilt. Id.

Fourth, Union claims that

> The Agency has failed to prove that the particular penalty imposed was reasonable and appropriately chosen for the specific conduct involved or was based on consideration of mitigating factors relevant to promotion of service efficiency.

Id. at p. 59. For example, the Union contends that the Grievant's removal was untimely. Id. It reasons that the delay between the investigation and the decision letter "...undercuts its assertion it considered the alleged misconduct to be serious." Id. at p. 60. See also, Id. at p. 61. In addition, the Union asserts that the Agency has failed to show that removal was the appropriate penalty in this case. Id. at p. 62. The Union not only disputes that the Grievant's actions impacted the "efficiency of the service," it challenges the decision that termination was reasonable given the facts and circumstances of this case. Id. In particular, utilizing the Douglas Factors as its guide, the Union reasons that even if a "lack of candor" was found, the Grievant's removal "exceeds the bounds of reasonableness." Id. at pp. 64-70.

Consequently, the Union requests that there is a finding that the Grievant's removal involved an improper denial of due process and that it failed to prove that the Grievant committed a lack of candor violation.. As a result, it requests e following remedies:

- An Order rescinding and cancelling the removal, along with retroactive reinstatement of [the Grievant] to his CBPO position, including placement at a grade and step he would have attained had the agency not removed him.
- An Order that the removal be rescinded.
- An Order that [the Grievant] be made whole in accordance with the Back Pay Act, including back pay with interest for all lost earnings, restoration of all lost benefits, including leaves, retroactive reinstatement of all health insurance benefits, restoration of all lost pension or other agency contributed retirement contributions or benefits, and back union dues to NTEU.
- An order that the Agency destroy all records referring to the charges against [the Grievant] and any evidence purportedly supporting those charges.

Id. at p. 72. The Union also "... requests that the Arbitrator retain jurisdiction over this matter to provide an opportunity for the Union to make a request for attorneys' fees and expenses in accordance with Article 28, Section 9 of the NCBA." Id.

## VI.    <u>Discussion</u>

The Agency essentially based the Grievant's removal for a "lack of candor" on the following alleged violations:

- Failure to include Bety in Section 18 and 19 of the 2019 e-QIP.
- Failure to be forthcoming during his December 6, 2021 OPR interview.
- Appropriate application of the Douglas Factors in this case.

<u>See</u>, JE 9.

As noted by the MSPB:

> Lack of candor is a 'broad[] and...flexible concept whose contours and elements depend on the particular context and conduct involved.'...Lack of candor requires proof that the employee <u>knowingly</u> gave incorrect or incomplete information. (Emphasis added, citations omitted).

<u>Moncada v. Executive Office of the President, Office of Administration</u>, 2022 MSPB 25 (August 3, 2022).

Here, while the Agency failed to prove that the Grievant knowingly gave incorrect or incomplete information in answering Section 18 of the 2019 e-QIP or the 2021 OPR interview,[22] it did prove that, at the very minimum, the Grievant made careless misstatements on more than one occasion.  The Agency also failed to prove that the Grievant intentionally lied when he did not include Bety in Section 19 of the 2019 e-QIP or during his 2021 OPR interview since the Grievant's answers regarding Section 19 reflect reasonable conclusion that Bety did not qualify as a foreign contact with which he had "close and/or continuing contact...within the last seven (7) years."  In short, while the Agency proved, by more than a preponderance of the evidence, that the Grievant acted carelessly in completing Section 18 of his 2019 e-QIP, it failed to prove that the Grievant was intentionally dishonest in completing his 2019 e-QIP or during his 2021 OPR Investigation.

### A.    2019 e-QIP

As noted, one of the reasons the Agency removed the Grievant for a "lack of candor" violation was due to his failure to include Bety in Section 18 and 19 of the 2019 e-QIP.

---

[22]    The Grievant, himself, acknowledged that he took a "see no evil, hear no evil, speak no evil" when it came to Bety's immigration status:

> OPR:  I just want to make sure that you have no idea what the status of your sister is?
> Grievant:  No (while shaking head no)…
> OPR:  If she's an American citizen or in. the process of getting….
> Grievant:  No, I don't know actually (while shaking head no).  I can tell you like for sure I don't know what's the status of them in this case. <u>I'm not asking those type of things to my relatives</u>… (Emphasis added)

JE 11 at 17:42:43.  <u>See also</u>, 17:44:30

1. Section 18

Section 18 of the e-QIP asks respondents to: "Select each type of relative applicable to you, regardless if they are living or deceased." JE 8:541. See also, Id. at 627. The Grievant failed to list Bety on his 2013 e-QIP. JE 8. He repeated that mistake on his 2019 e-QIP form. Id. The Agency maintains that this proves he did so intentionally on his 2019 e-QIP because he had been warned of the same mistake on his 2013 e-QIP. Agency Post –Hearing Brief at p. 19. The facts, however, are a bit more nuanced.

The Agency conducted a follow-up report on the Grievant's 2013 e-QIP on June 2, 2014. JE 8:561. There is no indication in that report that the Grievant was informed of the seriousness of this omission, only that it was "discussed." Id. Importantly, no discipline or warning was documented. Instead, the Grievant's omission of Bety was characterized as a "minor correction." Id. Additionally, the Grievant's unrefuted testimony at the hearing was that he did not even see this report until preparing for this arbitration. Tr. 5:138-140. See also, JE 8:564. Consequently, there is insufficient proof to show that the Grievant received sufficient notice that the omission or mistake of failing to include Bety on the e-QIP could result in disciplinary action, much less his termination.

It should be noted, however, that the Grievant attempted to explain his error by testifying that he believed Section 18 was limited to "other relatives" who were U.S. citizens, while Section 19 was limited to "foreign contacts" (i.e., non-U.S. citizens). Tr. 5:135. Of course, Section 18 contains no such qualification. In short, the Grievant made the wrong assumption. As a result, by failing to ask for clarification and making a false assumption the Grievant was, at the very least, careless in answering Section 18.

2. Section 19

Section 19 of the e-QIP, on the other hand, asks respondents to list foreign nationals with whom the respondent has or had

> ...close and/or continuing contact...within the last seven (7) years...and with whom you, or your spouse, or cohabitant are bound by affection, influence, common interests, and/or obligation. Include associates as well as relatives, not previously listed in Section 18.

Id. at JE 8:627. See also, Id. at 548.

The Agency argued that the Grievant should have listed Bety under Section 19 because he acknowledged that he had: (a) been in contact with Bety approximately five times a year, (b) had seen Bety at his parent's house in Laredo and (c) has bbeen Facebook friends with Bety. According to the Agency those facts proved that Bety and the Grievant had had a "close and/or continuing contact within the last seven years." Agency Post-Hearing Brief at pp. 14-17. Upon closer examination, these "contacts" are less persuasive than they might appear at first glance.

First, the five annual contacts were never defined as to what, when, where, and how long. Second, the Grievant testified that the last time he saw Bety was when he happened to bump into her about a month earlier when checking in on his ill mother. Tr. 5:127. Indeed, he consistently testified, both during his OPR investigation and at the arbitration hearing, that he did not know where Bety lived. Third, the Grievant testified that he had only reached out to Bety over Facebook when he was unable to reach his parents and that she never responded. Id. at 128. Simply having

someone listed as a "friend" on Facebook, without more, does not prove you have a "close and/or continuing" relationship.  Finally, the Grievant testified that he had "very little" to "no" relationship with Bety and there was no evidence offered to refute that assertion other than those already reviewed.  Tr. 8:126.  See also, Id. at 72.  Consequently, the Grievant's answer on Section 19 was reasonable since his relationship with Bety did not appear to qualify as one involving "close and/or continuing contact...within the last seven (7) years."[23]

### B.  2021 OPR Interview

After noting the Grievant's omission of Bety on Section 18 and 19 of his 2019 e-QIP form, the Decision Letter upholding the Grievant's removal for a "lack of candor" states that "[m]ore importantly, you were not forthcoming when responding to the [OPR] Agents during your sworn interview."  JE 9:762.  The OPR agents detailed four allegations in the 2021 OPR ROI:

- ALLEGATION ONE: From June From June 2017 to present, [the Grievant] associated with his non-citizen sister.[24]

- ALLEGATION TWO: On July 12, 2017, [the Grievant] did not list his noncitizen sister on his equip periodic background investigation

- ALLEGATION THREE: On December 6, 2021. [The Grievant] was untruthful and told OPR/HOU that he did not know if his sister was a non-citizen

- ALLEGATION FOUR On December 6, 2021. [The Grievant] admitted that his sister was not a US citizen.

JE 6:2.  Consequently, the Agency based its decision on three Specifications:

Specification 1: On or about July 12. 2019, you failed to list your sister, Martha Beatriz Rios Cardenas, a.k.a. Bety Rios, as required in Section 18 - Relatives of your Electronic Questionnaire for Investigation Processing (e-QIP), which is part of your periodic background investigation required for employment with CBP. You certified the veracity and completeness of your responses during your Person Subject Interview (PSI) on August 16, 2019.  Yet, you failed to list your sister Martha Beatriz Rios Cardenas, a.k.a. Bety Rios.

Specification 2: On or about July 12. 2019, you failed to list your sister, Martha Beatriz Rios Cardenas, a.k.a. as Bety Rios, as required in Section 19 - Foreign

---

[23]    Obviously, the term "close and/or continuing contact" is unnecessarily vague and, thus, fails to provide employees with sufficient notice.  I would strongly suggest the Agency attempt to quantify those terms, to the extent possible, to avoid any future confusion.

[24]    Rita Hubbard, the Agency's HRM Program Manager testified that they did not charge the Grievant with association with a non-citizen (Allegation One).  Tr. 3:57.

Contacts of your Electronic Questionnaire for Investigation Processing (e-QIP), which is part of your periodic background investigation required for employment with CBP. You certified the veracity and completeness of your responses during your Person Subject Interview (PSI) on August 16, 2019. Yet, you failed to list your sister, Martha Beatriz Rios Cardenas, a.k.a. Bety Rios.

Specification 3: On December 6, 2021, during official interview with CBP Office of Professional Responsibility (OPR) Agents, you were questioned about your sister Ms. Martha Beatriz Rios Cardenas, a.k.a. Bety Rios. You were specifically asked if your sister Bety Rios was a U.S. citizen, to which you responded that you were not aware of your sister's immigration status. During further questioning, you said that you were not sure of her status, and then repeatedly stated that you did not know her status. You were also questioned with respect to your responses during your background investigation and you stated your answers were accurate. You were asked if your sister was currently living with your parents. You responded that you did not know. However, after the OPR Agents repeated the question, you said that you see her there when you visit your parents. After an interview recess, you told the Agents that you remembered she was not a U.S. citizen. You were also asked if your sister is currently living in Mexico, or the U.S. and you responded you did not know where she is living. However, you admitted to having contact with her. You failed to provide truthful responses to OPR during your interview.

JE 5: 415. A close inspection of the OPR interview, the ROI, and the hearing testimony reveals that the Agency fell short in proving the Grievant knowingly gave incorrect or incomplete information during the OPR interview regarding: (1) whether he knew Bety's immigration status, (2) whether he knew where Bety resided, and (3) whether he had "close and/or continuous contact" with Bety.

  1. Did the Grievant knowingly give false or incomplete information regarding Bety's immigration status?

In the ROI's "Narrative," SA Salmon reported that the Grievant knew Bety's immigration status: "…During the interview SA Donnelly asked [the Grievant] how he suddenly recalled that his sister was a non-citizen. [The Grievant] replied, "Just remembered." JE 6:425. This conclusion, however, mischaracterizes what the Grievant repeatedly stated during his OPR investigation:

*At 17:40:11[25]*
OPR: So, the allegation that we got is that your sister lives there at the residence we just discussed 716 Buffalo and that she is a noncitizen?
Grievant: I don't know, man, I don't know.
OPR: Do you know if your sister is a noncitizen or if she, has a green card, or…?
Grievant: I don't know….(inaudible)…I don't know what's her status in this country.

---

[25] All video times are approximate and will be listed in "Hour:Minute:Second."

*At 17:40:47*
OPR:  So you don't know what her status is or anything?
Grievant:  Negative.

*At 17:41:13*
OPR:  So you are telling me you have no idea if your sister is a naturalized citizen or illegal--an undocumented alien?
Grievant:  No (while shaking head no)

*At 17:42:43*
OPR:  I just want to make sure that you have no idea what the status of your sister is?
Grievant:  No (while shaking head no)…
OPR:  If she's an American citizen or in. the process of getting….
Grievant:  No, I don't know actually (while shaking head no).  I can tell you like for sure I don't know what's the status of them in this case ….I'm not asking those type of things to my relatives…you know what I mean.
OPR:  Yes Sir.

*At 17:44:53*
OPR:  Could it be possible that she's an undocumented noncitizen?
Grievant:  I don't know.  I'm not going to say if she is or is she's not.  I don't know.

*At 17:48:13*
Grievant:  You asked me if she was a U.S. Citizen or not right?
OPR:  Yes sir.
Grievant:  Ok.  Yeah, like she's not a US citizen obviously what I know she's a national Mexican but that's as far I know.
OPR:  So she's not a citizen right?  No she's not.
Rios testified that he came back and stated that his sister Martha was born in Mexico and that she was a Mexican national but that didn't change the fact that he did not know her immigration status.  TR 5, p. 159.

*At 17:48:36*
OPR:  Is she trying to get her residency, do you know sir is she in the process of getting her residency do you know?
Grievant:  I don't know about that.
OPR:  You have no idea?
Grievant:  No.

*At 17:56:57*
OPR:  Do you know if your sister is illegally in the United States?
Grievant:  No.  I already told you.  No.
OPR:  Do you know if your sister is working illegally in the United States?

> Grievant:  No, I don't know

JE 11.

Second, SA Salmon acknowledges in his ROI that the Grievant repeatedly denied he knew where Bety's immigration status:

> \*\*\*
>
> [I] asked [the Grievant] if his sister Bety was a US citizen. [The Grievant] stated that he was not aware of her immigration status. [I] reminded [the Grievant] that as a CBPO he enforced immigration laws and it is prohibited to allow noncitizens to work and reside in the U.S. [The Grievant] acknowledged his statement and replied he was not sure of her status.
>
> [I] advised [the Grievant] that his EQIP periodic background investigation paperwork required him to list all family members or contacts with foreign nationals. [The Grievant] repeated that he was not aware of his sister's status… (Emphasis added)
>
> \*\*\*

JE 6:424-425.  The arbitration testimony reinforced the notion that the Grievant was not aware of Bety's immigration status. See, Tr. 1:58-59, 5:178-179

Finally, while the Grievant admitted that he knew Bety was a foreign national who was not a U.S. citizen, he never admitted he knew that Bety was in the country illegally.  Even SA Salmon acknowledged that simply because a person is a foreign national and not a U.S. citizen, does not mean that person is in the United States unlawfully.  Tr. 1:83.  However, both Agency HR Program Manager Hubbard and SA Salmon appear to have incorrectly assumed in this case that simply because the Grievant was aware that Bety was Mexican national and not a U.S. citizen meant that the Grievant was aware that Bety was in the county illegally.  See, Tr. 1:82, 84-85, 89, Tr. 2:51 and Tr. 3:92, 124.  See also, Tr. 5:74-78. JE 11 and AE 4-5.  That was a fatal flaw in their analysis.

> 2.  Did the Grievant knowingly give false or incomplete information regarding where Bety resided?

In the ROI's "Narrative," SA Salmon reported that the Grievant knew where Bety was living:

> \*\*\*
>
> SA Salmon asked if he [the Grievant] had a sister who resided at his parent's residence. [The Grievant] replied "Yes, [Bety]." (Video time stamp omitted).
>
> \*\*\*

JE 6:424.  This conclusion, however, mischaracterizes what the Grievant actually said.  In fact, the Grievant repeatedly said quite the opposite:

> *At 17:41:22*
> OPR:  Is your sister currently living at this residence now?

GRIEVANT:  As far as I know (shakes head no)[26]
<div align="center">***</div>

*At 17:45:54*
OPR:  So how long has your sister lived here then?
Grievant:  What was that again?
OPR:  How long has your sister lived in Laredo then?
[Grievant]:  What do you mean?
OPR:  How long has your sister lived with your parents?
[Grievant]:  I don't know.  I don't know if, if she's living with my parents or not.  I don't know what the question….(inaudible)
OPR:  So you're telling me that you don't know if your sister is living with your parents or not?
[Grievant]:  Yeah.
OPR:  You don't have no idea?
[Grievant]:  No no no…I know that sometimes when they're there, she's there but I don't know if she's living or not…and they're telling me that she's taking care of kids…like I don't know like..(inaudible)….I haven't seen that so I cannot say how long she's been there or not…like I don't know….that's putting me in a spot because I don't know exactly what's going on.
<div align="center">***</div>

*At 17:55:19*
OPR:  Where does your sister live now?
[Grievant]:  I don't know like I don't know where she lives.
OPR:  You talk to your sister five or six times a year and you don't know where she lives.
[Grievant]:  I don't visit her.  Like that's….
OPR:  I didn't ask if you visited her, I asked do you know where she lives.
[Grievant]:  No, No I don't know where she lives.
<div align="center">**</div>

OPR:  Does your sister live in the United States or Mexico?
[Grievant]:  Like I said I don't know if she lives in Mexico or if she lives in Laredo Texas….I don't know.  I don't ask her hey what's going on.  I don't put myself asking that type of questions to my family.
OPR:  Just for the record, you're going to sit here and tell me you talk to your sister but you have no idea if she's lives in this country or she's living in another country?  That's what you are telling me?
[Grievant]:  As far as I Know….
OPR:  Just yes or no.  Is that your statement here today?
[Grievant]:  What was that?
OPR:  Is your statement to me today that when you speak to your sister you don't know if she's in the United States or she's in Mexico and you have no idea where she resides?
[Grievant]:  No
OPR:  Is that your statement to me now?

---

[26]   The Grievant testified that in this instance he wanted to say "no," but instead he shook his head and forgot to say no verbally. Tr. 5:155.  I reviewed that portion of the video closely and the Grievant did, indeed, appear to shake his head "no."

[Grievant]:  Yeah.

*At 17:56:38*
OPR:  Have you ever spoken to your parents about your sister and where she lives?
[Grievant]:  No.
OPR:  Do you know if you sister is in the United States right now?
[Grievant]:  No.
 OPR:  You don't know?
[Grievant]:  No.

\*\*\*

JE 10.  Clearly, SA Salmon was incorrect when he wrote in the ROI that the Grievant said "yes" when asked if he knew where Bety lived.  Instead, it appears that SA Salmon and Agency HR Project Manager Hubbard made yet another incorrect assumption; this time that the Grievant knew that Bety resided with his parents simply because the Grievant had seen Bety at their parent's residence on occasion.  See, Tr. 1:146-148 and Tr. 3:59.

Yet again, the ROI contradicts itself on an important point by conceding that the Grievant repeatedly denied he knew where Bety lived:

> SA Salmon asked [The Grievant] if his sister Bety was currently living with his parents. [The Grievant] replied that he did not know.[27] (Video time stamp omitted)
> \*\*\*
> SA Donnelly asked if his sister was living in Mexico or the U.S. [The Grievant] stated he did not know.  SA Donnelly asked [the Grievant] if he knew where his sister was currently living. [The Grievant] stated that he did not know where she was living.  (Video time stamp omitted)

\*\*\*

JE: 8:425.  See also, JE 10.  Moreover, the Grievant testified at the arbitration hearing, consistent with the responses he gave in the OPR Interview, that he did not know where Bety lived.  See e.g., Tr. 1:128-129.  As a result, the Agency appears to have mistakenly relied on the finding in the ROI that the Grievant lied when he stated he did not know where Bety lived.

3. Did the Grievant knowingly give false or incomplete information regarding whether he had "close and/or continuous contact" with Bety?

In addition, in the Report's "Narrative," SA Salmon supported his conclusion that the Grievant and Bety had "close and/or continuous contact" based, in part, because they had seen her approximately a month earlier when he was visiting his sick mother who was ill. JE 8:425. In addition, SA Salmon relied on the Grievant's admission that he had approximately five "contacts" with Bety a year and was a Facebook friend.  See, JE 11 at 17:14:25, 35:18, 39:42, 51:18, and 58:50.  SA Salmon and SA Donnelly, however, never determined the what, when and

---

[27]   SA Salmon repeated the question, this time of the Grievant replied 'yes, when she is there.' (Video time stamp omitted)

how of those "contacts." Moreover, a review of the video of the OPR interview and the arbitration testimony reveals that the Grievant's relationship with Bety was minimal:

- The Grievant did not know where Bety lived. Tr. 5:127-128. <u>See also</u>, JE 11 at 17:40:00 and 17:46:15.
- The last time the Grievant saw Bety was about a month earlier when she happened to be there while he was visiting his sick mother. Tr. 5:126. <u>See also</u>, JE 11 at 17:50:00.
- While the Grievant and Bety were Facebook friends, she did not respond the one time he reached out to her to ask about their parents. Tr. 5:127. <u>See also</u>, JE 11 at 17:58:54.
- The Grievant did not know Bety's birthday. Tr. 5:185. <u>See also</u>, JE 11 at 17:41:45
- The Grievant did not know they call her Bety
- The Grievant did not know if Bety was married. JE 11 at 17:46:49
- Bety was 16 years older than the Grievant and they did not grow up in the same household. Tr. 5:123 and 125. <u>See also</u>, JE 11 at 17:52:10
- While the Grievant knew that Bety was a Mexican national and that she was not a U.S. citizen, he did not know her immigration status.

As a result, the ill-defined quality of the contacts, coupled with the limited quantity of interactions, falls short of proving that the Grievant knowingly gave false information regarding whether he had "close and/or continuous contact" with Bety.

## C. Douglas Factors

The MSPB's landmark decision in <u>Douglas v. Veterans Administration,</u> 5 MSPR 280 (1981) set forth the aptly named "Douglas Factors" which have been incorporated into the parties' CBA as Appendix D. <u>See</u>, JE 1:Appendix D. In this case, Agency management stated that it considered the Douglas Factors before making their decision in this matter. Tr. 4:88. <u>See also</u>, Agency Post-Hearing Brief at pp. 24-27. An application of the Douglas Factors in this case, however, militates in favor of reducing the Grievant's removal to a lower, but substantial, form of discipline. To wit:

### 1. <u>Nature and Seriousness of the Offense</u>

Here, the evidence falls short of showing that the Grievant knowingly provided false information on his 2019 e-QIP or during his 2021 OPR interview. The evidence does prove, however, that the Grievant made careless misstatements or misrepresentations on both occasions. And while he may not have made those careless misstatements or misrepresentations intentionally or maliciously, he made them repeatedly (i.e., on his 2019 e-QIP and 2021 OPR interview, as well as on his 2013 e-QIP form).

### 2. <u>Type of Employment</u>

While the Grievant's job involved contacts with the public, he was not in a supervisory position. That being said, the Agency correctly points out that the Grievant "...was a federal law

enforcement officer and thus, is held to a higher standard of conduct because he serves in a position of public trust." Agency Post-Hearing Brief at p. 25.   In addition, the CBP's Standards of Conduct requires employees to perform their duties "conscientiously."  JE 2:360.  Here, the Grievant made repeated mistakes regarding filling out the e-QIP, as well as failing to seek clarification on those questions he did not understand during his 2021 OPR interview.  As a result, this would appear to be an aggravating factor in this matter.

### 3. Past Disciplinary Record

This factor would appear to work in favor of the Grievant since, in the eight years prior to his removal, he was not disciplined for any infractons.  In short, this is a first time offense.

### 4. Past Work Record

This is another factor that appears to work in the Greivant's favor.  The Grievant has a record of volunteering for assignments to advance his career, as well as completing a number of certifications.[28]  Not only was no evidence provided regarding the Grievant's poor performance prior to the alleged infractions in 2019 and 2021, he appears to have performed his job satisfactorily the entire time he was employed up and until the date he was removed. In sum, the Grievant had an eight year work record of acceptable performance.  Moreover, no problems were noted regarding his ability to get along with fellow workers or his dependability.  See, Tr. 5:61-53.

### 5. Effect on Ability to Perform the Job

If a "lack of candor" charge were upheld in this case, the answer might be different since it could have impacted the Grievant's ability as a witness.  See, AE 3 (DHS *Giglio* Policy).  This case, however, concerns an employee making repeated careless misstatements on official documents, as well as making careless misrepresentations during his 2021 OPR Interview because he failed to clarify his answers.  Other than the instant matter, there is nothing in the record to suggest that the Grievant has not or could not perform his job in a satisfactory manner. Moreover, there was no evidence offered that his actions effected his supervisor's confidence in his ability to perform his assigned duties.

### 6. Consistency of the Penalty with Those Similarly Situated

The Union has provided several "lack of candor" cases that have not resulted in dismissal.  See, JE 8:518-523. See also, Union Post-Hearing Brief at pp. 68-70.  However, these cases are not on point since the Grievant's actions are best described as an unintentional "careless misstatement or misrepresentation," rather than an intentional "lack of candor."

---

[28]   The Grievant has the following certifications: held the following certifications: Field Training Officer (FTO), Mobile Field Force (MFF) Phase 1 & Phase 2, Individual First Aid Kit (IFAK), Basic Crime Scene Investigation (BCSI), Gemini Rapid Response Strip, and Backscatter Gen 4 (ZBV).  Tr. 5:62-63.

7. <u>Consistency of the Penalty with Agency's Table of Penalties</u>

The Agency cites the CBP Penalty Guide to support its position that removal was the proper penalty in this matter. This focus is misplaced since the evidence falls short of a "lack of candor" finding. The CBP Penalty Guide, however, does support a 7-14 day suspension for a "careless misstatement or misrepresentation," if the case has "aggravated" factors, as well as a range of a 7 day suspension to removal for "subsequent offenses."[29] In this case, the Grievant made careless misstatements on the same official employment documents not once, but twice. Two qualifications, however, are important.

First, the CBP Penalty Guide is just that—a guide. As specifically noted in the preface:

> This Table of Offenses and Penalties (Table) serves as <u>guide</u>...in assessing the appropriate penalties for common types of misconduct...<u>The Table is provided as a guide, not as a set of mandatory rules; it does not relieve supervisors and managers of the responsibility of using good judgement when taking corrective action</u>. (Emphasis added)

JE 4:383. As such, I have considered the CBP Penalty Guide in light of the unique facts of this case.

Second, there is a question if the "discussion" regarding accurately filling out the 2013 e-QIP would qualify as the basis for finding a "subsequent offense" when the Grievant made the very same mistake on his 2019 e-QIP application. <u>See</u>, JE 8:561. Regardless, at the very least it was a subsequent mistake that merits a more serious level of discipline.

8. <u>Impact on Agency's Reputation</u>

An employee's unintentional, albeit repeated, "careless misstatement or misrepresentation" dos not have the same impact on the Agency's reputation as a "lack of candor."[30] Therefore, this factor would appear to have little weight in this matter.[31]

9. <u>Prior Notice</u>

As documented, the Grievant was well aware of the importance of accurately completing his e-QIP, as well as providing accurate information during the OPR interview. In addition, the omission of Bety on the Grievant's 2013 e-QIP was "discussed" with the Grievant. JE 8:561. On balance, it would appear that the Grievant received adequate notice that

---

[29]  The CBP Penalty Guide notes that "...proposing and deciding officials should use the 'Subsequent Offenses' column to select a penalty when also considering past misconduct." JE 4: 384. Since what constitutes "past misconduct" is not defined, I interpret it to mean related misconduct, whether it resulted in formal discipline or an informal discussion with the employee.

[30]  <u>See,</u> A3 (DHS *Giglio* Policy).

[31]  It is also noteworthy to note that the Grievant's initial alleged infraction occurred in July 12, 2019, yet the OPR investigation did not occur until December 6, 2021 and the decision to remove the Grievant as a CBPO did not occur until July 18, 2022—over three years after the alleged violation. It would appear that an action that merited an employee's termination on the first offense would or should have resulted in more prompt action.

making even an unintentional "careless misstatement or misrepresentation" on the e-QIP or in his OPR interview could result in serious discipline.

### 10. Potential for Rehabilitation

The fact that the Grievant is an eight year employee with a satisfactory work record who has never been disciplined is a factor that weighs in his favor.

### 11. Mitigating Circumstances

A mitigating factor in this case is the way the 2021 OPR interview was conducted and how it impacted the findings in the subsequent ROI. As noted earlier, there are numerous examples of SA Salmon and SA Donnelly asking confusing and compound questions (e.g., using immigration terms imprecisely), as well as failing to seek clarification on important issues (e.g., what constituted "contacts" with Bety). They also made several incorrect assumptions in the ROI (e.g., that the Grievant knew Bety lived with his parents). The incomplete and/or inaccurate information that was conveyed in the ROI was heavily relied on by the decision-makers in this case. Tr. 3:126. It therefore begs the question as to whether the Agency might have made a different decision if they had been aware of these errors.

### 12. Adequacy and Effectiveness of Alternative Sanctions

As a general rule, the purpose of discipline is to instruct and correct, rather than to punish Indeed, that is the very point behind the concept of "progressive discipline." Article 46, Section 4 of the parties' CBA explicitly recognizes that fact:

> Section 4. Adverse action <u>penalties will be imposed to correct behavior, teach the employee and others</u> that certain actions are unacceptable for an employee of CBP, and to demonstrate and support the expected high standards of conduct for CBP. As such, <u>adverse actions under this article shall generally be progressive in nature</u>, and will give appropriate consideration to the...Douglas Factors. (Emphasis added)

JE 1**:**285**.**

Here, the Agency appeared to take the position that every "lack of candor" finding should result in an automatic termination. <u>See</u>, Tr. 4:87. While that may or may not be open to dispute, that is not this case. This case concerns an unintentional, albeit repeated, "careless misstatement[s] or misrepresentation[s]" (rather than an intentional "lack of candor") by an eight year employee with satisfactory job performance who had never received prior discipline. Thus, removal would appear to be excessively punitive and, thus, unwarranted based upon the totality of the circumstances. Consequently, some other form of corrective discipline, more appropriate to the circumstances, would appear to be reasonable.

**VII.**    <u>**Decision**</u>

The Agency failed to prove that the Grievant intentionally lied when he did not include his sister, Bety, in Section 19 of the 2019 e-QIP or during his subsequent OPR interview because, while Bety was a foreign national, she did not have "close and/or continuing contact...within the last seven (7) years" with the Grievant.

The Agency did, however, prove that the Grievant's omission of Bety in Section 18 of the 2019 e-QIP and his responses in his subsequent OPR interview were unintentional, but repeated, "careless misstatement[s] or misrepresentation[s]."

Therefore, the Grievant's removal shall be converted to 28 day unpaid suspension. Any backpay due will be reduced by any money that the Grievant earned or reasonably could have been earned as the result of a diligent job search.

I will retain jurisdiction on this matter pending full implementation of this award.

Respectfully submitted,

Mark J. Keppler
Labor-Management Arbitrator

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | |
|---|---|
| _____ ) | |
| J. Jesus Rios, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY, CUSTOMS AND BORDER ) | |
| PROTECTION, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, with attachment,

was served via first class mail, on October 25, 2023, on Felix R.

Martinez Velez, Attorney, Office of Assistant Chief Counsel, U.S.

Customs and Border Protection, 5810 San Bernando Avenue, Suite 490,

Laredo, TX 78041.

　　　 /s/ Allison C. Giles
　　　 Allison C. Giles
　　　 Assistant Counsel
　　　 National Treasury Employees Union
　　　 800 K Street, N.W., Suite 1000
　　　 Washington, D.C. 20001
　　　 (202) 572-5500
　　　 Counsel for Petitioner